1
2
3
4
5
6
7                    UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF WASHINGTON
8                              AT SEATTLE
9

10   PRESERVE OUR ISLAND, a Washington
     Non-Profit Corporation; PEOPLE FOR PUGET
11   SOUND; a Washington Non-Profit Corporation;        CASE NO. C08-1353RSM
     WASHINGTON ENVIRONMENTAL
12   COUNCIL, a Washington Non-Profit                   ORDER ON CROSS MOTIONS FOR
     Corporation;                                       SUMMARY JUDGMENT
13
                         Plaintiff,
14
                   v.
15
     U.S. ARMY CORPS OF ENGINEERS, et al.,
16
                         Defendants.
17   And
18   NORTHWEST AGGREGATES COMPANY,
19                       Defendant-Intervenor.
20

21       Plaintiffs filed this action in a complaint for declaratory and injunctive relief on September 9,

22   2008.  Dkt. # 1.  An amended complaint was filed November 19, 2008.  Dkt. # 10.  Plaintiffs challenge

23   the issuance of a permit by defendant Army Corps of Engineers ("Corps") for the construction of a

24   barge-loading facility on the eastern shore of Maury Island, an island in Puget Sound located within

25   King County, Washington.  Plaintiffs allege that agency actions leading to the issuance of the permit,

26   and the permit itself, violate the National Environmental Policy Act, 42 U.S.C.  § 4321, *et seq*.

27

28   ORDER - 1

("NEPA"); Section 10 of the Rivers and Harbors Act, 33 U.S.C. § 403 ("RHA"); and Section 7(a)(2) of the Endangered Species Act, 16 U.S.C. § 1536 ("ESA").   The Court has jurisdiction over the matter pursuant to 28 U.S.C. §§ 1331, 2201, and 2202, as well as 16 U.S.C. § 1540(g)(1).  Review is governed by § 706 of the Administrative Procedure Act, 5 U.S.C. § 706.  The Court may set aside an agency action if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or if it was found to be "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D); *Pyramid Lake Paiute Tribe of Indians v. United States Dep't of the Navy*, 898 F.2d 1410, 1414 (9th Cir.1990).

The matter is before the Court for consideration of the parties' cross-motions for summary judgment.  Dkt ## 50, 53.  Oral argument was heard on August 10, 2009, and the matter has been fully considered.  For the reasons set forth below, the Court shall grant in part, and deny in part, plaintiffs' motion, and shall deny in full defendants' cross-motions.

## FACTUAL AND PROCEDURAL BACKGROUND

In August of 2000, Defendant Northwest Aggregates, also known as Glacier Northwest ("Northwest") applied to the Army Corps of Engineers ("Corps") for a permit to repair a dock on Maury Island under Section 10 of the Rivers and Harbors Act, 33 U.S.C. § 403 *et seq*.  The proposed project involves removing an old deteriorating dock and wooden pilings, and replacing it with a  new dock with steel pilings.  Dolphins will extend in both directions from the ends of the T-shaped dock, parallel to the shoreline.   The purpose of the dock is to allow the loading of barges with sand and gravel mined from Northwest's property on Maury Island.  The permit application underwent review processes under the Endangered Species Act ("ESA"), National Environmental Policy Act ("NEPA"), and Section 10 of the Rivers and Harbors Act ("RHA"), each of which will be described in more detail below.  Northwest also applied for various state and local permits, which are not at issue here.

Under the ESA, the permitting agency (the Corps) is required to consult with the National Marine Fisheries Service (NMFS, or NOAA Fisheries, as it is now called) or with the Fish and Wildlife Service ("FWS")  regarding possible effects of the project on endangered or threatened species—in this case, Puget Sound Chinook, bull trout, and Southern Resident Killer Whales (SR Orcas).  At the time

the original application was submitted, Puget Sound Chinook and bull trout were already listed under the ESA. Puget Sound Chinook were listed as threatened on March 21, 1999. The "threatened" status was re-affirmed on June 28, 2005. Critical habitat designation for Chinook was published by NMFS on September 2, 2005, with an effective date of January 2, 2006. 70 Fed. Register 52630 ( Sept. 2, 2005). NMFS announced adoption of a Recovery Plan for Puget Sound Chinook on January 19, 2007. 73 FR 2493.

The Southern Resident Killer Whale (*Orcinus orca*) was listed as endangered under the ESA on November 18, 2005. 70 Fed. Reg. 69903. A 2006 challenge to this listing by the Washington State Farm Bureau and the Building Industry Association of Washington was dismissed by this Court in 2006. *Washington State Farm Bureau, et al., v. National Marine Fisheries Service, et al.,* C06-388TSZ, Dkt. # 42. Orca critical habitat was designated on November 29, 2006. 71 Fed. Reg. 69054. The 2008 "Recovery Plan for Southern Resident Killer Whales (*Orcinus orca)"* was prepared by the NMFS and approved on January 17, 2008. Notice was published in the Federal Register on January 24, 2008. 73 Fed. Reg. 4176.

ESA consultation for the proposed project occurred over a six-year period, from 2000 through early 2007, through several iterations. Northwest prepared a Draft Biological Evaluation ("BE"), which appears in the record beginning at Corps of Engineers Administrative Record ("COE AR") 5409. Upon review of this BE, the Corps requested formal consultation with NMFS on September 12, 2002, as the Corps had determined that the project was "likely to adversely affect" listed species, specifically Puget Sound Chinook and its critical habitat. After Northwest proposed modifications to the project, NMFS on February 10, 2004 concurred with the Corps that the proposed action "may affect, but is not likely to adversely affect" Puget Sound Chinook. COE AR at 6678-80. The proposed modifications included extending the dock to move the loading facility further offshore (to reduce impact on eelgrass beds), removal of all existing creosote-treated pilings, and the use of a bubble curtain to contain and reduce noise from pile driving. *Id.* The proposed modifications also set a window of time for in-water work, so that it would only be done "when juvenile salmon will be minimally present and when forage fish are not spawning." *Id.*, at 6679.

ORDER - 3

Further consultation between the agencies was initiated in 2005 as a result of the impending listing of the Southern Resident Orca as an endangered species, together with the critical habitat determination for Chinook.  On June 21, 2005, NMFS concurred with the Corps' determination that the proposed action was not likely to "jeopardize the continued existence" of the SR Orcas, and "may affect" but was "not likely to adversely affect" Chinook critical habitat.  COE AR at 8057-59. Following the actual listing of the SR Orcas as endangered, NMFS in November 2006 issued a letter again concurring in the Corps' determination that the project "may affect, but was not likely to adversely affect" the SR Orca or its critical habitat.  COE AR  10345-10354.  In January, 2007, NMFS responded to a Corps request for re-initiation of consultation following final determination of SR Orca critical habitat designation, again affirming the agency's  "not likely to adversely affect" conclusions. COE AR 10378-10380.

At the same time, ESA consultation occurred between the Corps and Fish and Wildlife Service (FWS) regarding bull trout.  FWS issued a determination that the project "may affect, but was "not likely to adversely affect" bull trout designated critical habitat.

With respect to NEPA compliance, the Corps conducted its own environmental review,  issued an Environmental Assessment ("EA") on June 8, 2008, and promulgated a Finding of No Significant Impact ("FONSI").  COE AR at 13183-86, 13187-13249.

The Section 10 permit was issued to Northwest on July 2, 2008.  COE AR 13465.  The permit contains various restrictions on in-water work related to the presence of spawning forage fish such as herring and sand lance.  The net effect of these restrictions, together with additional restrictions imposed by the State of Washington,  is that work below the high water line is prohibited from February 15 through August 14 to protect juvenile salmon, and between January 15 and April 14 for the protection of spawning herring.  Thus, in-water work is completely prohibited from January 15 to August 14, and permitted  with limitations to protect forage fish between October 15 and January 15.  In addition, Northwest is to monitor for the presence of Orcas between October 1 and February 15, and cease any noise-generating activity such as pile-driving if Orcas are detected in the area.  COE AR 13467.

Northwest began work on removing the old dock on December 5, 2008.  Plaintiffs filed a motion

for a temporary restraining order ("TRO") shortly thereafter, asking the Court to halt work for the protection of SR Orcas, which were seen in the area on December 7, 2008. Dkt. ## 25, 34, 41. The Court denied the motion for a TRO, finding that plaintiffs had not established the requisite likelihood of irreparable harm as no Orcas were seen in the project area after December 7. *Id.* Work on the dock thus continued until Northwest was required to stop by the terms of the permit on January 15, 2009. It is scheduled to resume on August 15, 2009.

Plaintiffs in their motion for summary judgment ask the Court to declare that the federal agencies' actions with respect to the permit were arbitrary and capricious and in violation of ESA, NEPA, and RHA. They further ask that the Court permanently enjoin all activities authorized under the permits. Defendants, including the federal defendants and intervenor Northwest, have opposed the motion and cross-moved for summary judgment in their favor.

ANALYSIS

## I. <u>Endangered Species Act Review</u>

Judicial review of administrative decisions involving the ESA is governed by section 706 of the Administrative Procedure Act, 5 U.S.C. § 706. A court may set aside an agency action if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or if it was found to be "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D); *Pyramid Lake Paiute Tribe of Indians v. United States Dep't of the Navy*, 898 F.2d 1410, 1414 (9th Cir.1990). Although the Court does not substitute its own judgment for the agency's, it should "engage in a careful, searching review to ensure that the agency has made a rational analysis and decision on the record before it." *National Wildlife Federation v. NMFS*, 524 F.3d 917, 927 (2008).

The Endangered Species Act contains substantive and procedural provisions designed to protect species listed as threatened or endangered under the Act. The substantive provision relevant to this case is § 7, which prohibits federal agencies such as the Corps from taking discretionary actions that would "jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species ...." 16 U.S.C. § 1536(a)(2). Section 7(a)(2) of the ESA imposes a procedural duty on federal agencies to consult with either the National

ORDER - 5

Marine Fisheries Service or the FWS ("Service") before engaging in a discretionary action which may affect listed species. 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.14, 402.01(b). The agencies are directed, in consultation with the Service, to "utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered species and threatened species," and to "insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical habitat] of such species." 16 U.S.C. § 1536(a)(1), (2). An agency's decision whether to take a discretionary action that may jeopardize endangered or threatened species is thus strictly governed by ESA-mandated inter-agency consultation procedures. *Id*. § 1536(c); *Thomas v. Peterson*, 753 F.2d 754, 764 (9th Cir.1985) ("[T]he strict substantive provisions of the ESA justify more stringent enforcement of its procedural requirements, because the procedural requirements are designed to ensure compliance with the substantive provisions.").

ESA and the implementing regulations provide that the agency contemplating the action must first request information from the appropriate federal wildlife service regarding "whether any species which is listed or proposed to be listed may be present in the area of such proposed action." 16 U.S.C. § 1536(c)(1). In this case, the appropriate wildlife service is the National Marine Fisheries Service (NMFS) for Chinook and SR Orcas, and the Fish and Wildlife Service for bull trout.[1] If the wildlife service determines that listed species may be present in the affected area, the agency preparing to act (here, the Corps) must produce a "biological assessment" ("BA") in accordance with the National Environmental Policy Act "for the purpose of identifying any endangered species or threatened species which is likely to be affected by such action." *Id*. If the biological assessment concludes that listed species are in fact likely to be adversely affected, the agency ordinarily must enter "formal consultation" with the wildlife service. *Id*. § 1536(a)(2); *Thomas*, 753 F.2d at 763. Formal consultation requires the wildlife service to produce a "biological opinion" ("BiOp") that evaluates in detail the nature and extent of the proposed action's effect on the listed species and, if necessary, posits reasonable and prudent alternatives to the

---

[1]FWS has jurisdiction over freshwater and terrestrial species while the National Marine Fisheries Service is responsible for anadromous and marine species. 50 C.F.R. § 402.01(b).

ORDER - 6

proposed action. 16 U.S.C. § 1536(b)(3)(A); *Pacific Rivers Council v. Thomas*, 30 F.3d 1050, 1054 n. 8 (9th Cir.1994).   The purpose of the consultation procedure is to allow the Fisheries Service or the FWS to determine whether the federal action is likely to jeopardize the survival of a protected species or result in the destruction of its critical habitat, and if so, to identify reasonable and prudent alternatives that will avoid the action's unfavorable impacts. *See* 16 U.S.C. § 1536(b)(3)(A).

Following the issuance of a biological assessment which determines that listed species are likely to be adversely affected, the agency may attempt to avoid the lengthy and costly process of formal consultation with the Service by voluntarily initiating a less rigorous regulatory procedure called "informal consultation." 50 C.F.R. § 402.13.   That is, the federal agency may conduct informal consultation with the Service if the agency determines that any action on its part "may affect", but is "not likely to adversely affect", any listed species or critical habitat, **and** the Director of the Service concurs in writing to the agency's determination. 50 C.F.R. §§ 402.13;  402.14(a).   Informal consultation is an optional process that includes all discussions, correspondence, reports, and so forth, exchanged between the Service (FWS or NMFS) and the Federal agency, designed to assist the Federal agency in determining whether formal consultation or a conference is required.  If during informal consultation it is determined by the Federal agency, with the written concurrence of the appropriate Service, that the action is not likely to adversely affect listed species or critical habitat, the consultation process is terminated, and no further action is necessary.  50 C.F.R. § 402.13(a).  In other words, regardless of whether a biological assessment concludes that a proposed action would likely adversely affect listed species, if informal consultation is initiated and results in a finding that the proposed action would not in fact have such an effect, the agency is not required to engage in formal consultation.  50 C.F.R. § 402.14.[2] However, informal consultation must be re-initiated when (1) "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously

_____

[2]Under 50 C.F.R. § 402.14(b)(1), "[a] federal agency need not initiate formal consultation if, as the result of the preparation of a biological assessment under § 402.12 or as a result of informal consultation with the [Fish and Wildlife] Service under § 402.13, the Federal agency determines  . . . that the proposed action is not likely to adversely affect any listed species or critical habitat."

considered," or (2) "the identified action is

subsequently modified in a manner that causes an effect to the listed species or critical habitat that was

not considered in the biological opinion." 50 C.F.R. §§ 402.16(b), 402.16(c).

Plaintiffs contend that the agencies ignored or disregarded available data and thereby acted in an

arbitrary and capricious manner in reaching the "may effect, but is not likely to adversely affect"

determination with respect to Chinook salmon, bull trout, and the SR Resident Orca, and in avoiding

formal consultation. Plaintiffs also assert that the agencies failed to re-initiate consultation as required

regarding new information in the form of the recovery plans developed by NMFS for Chinook and for SR

Orcas. The Court finds merit to plaintiffs' arguments regarding Chinook and SR Orcas, and will address

those in turn.

    1. <u>The consultation failed to consider construction impacts on juvenile Chinook.</u>

The February 10, 2004 consultation letter concluded that Chinook were not likely to be adversely

affected by dock construction activities in part because the work windows ensured that in-water work

would be done when juvenile salmon were only "minimally present". This conclusion was based on

modifications in the work window prohibiting in-water work before August 15. The factual basis for the

determination was set forth in the BE:

> Juvenile chinook salmon is the lifestage most likely to be present in the affected area and
> has been documented in small numbers (EVS 2000). Estuaries of natal streams are preferred
> habitats and typically hold the highest density of both juvenile and adult chinook salmon.
> No natal streams are located on Vashon or Maury Island (EVS 2000). The nearest natal
> stream and estuary is approximately 6 miles to the south of the study area. The eel grass
> beds and substrate in the project vicinity provide refuge for chinook fry and a source of prey
> items. Juveniles and adults use the area primarily as a migratory corridor and do not rear in
> the area for any significant length of time or in any great numbers (EVS 2000).

COE AR 5441.

The record contains evidence that was presented to the Corps in the form of an August 2004

publication titled "Juvenile Salmon Composition, Timing, distribution and Diet in Marine Nearshore

Waters of Central Puget Sound in 2001-2002", prepared by James S. Brennan and others for the King

County Department of natural Resources and Parks ("Brennan Report"). COE AR 8195-8293.

ORDER - 8

The purpose of the study was to "investigate the use of marine nearshore waters by juvenile salmonids within the study area (central Puget Sound)". COE AR 8197. Sampling sites were selected throughout the study area, including at Vashon/Maury Islands. Data from the study show that despite the absence of natal streams on Vashon and Maury Islands, juvenile Chinook were caught in the islands' nearshore area throughout the sampling period, which extended from May through October, 2001, and April to December of 2002. *Id.* Catch of Chinook peaked in late July in 2001, and in both mid-June and mid-August in 2002. COE AR 8226. Although this study was directed at central Puget Sound was not specifically directed at Vashon and Maury Island areas, these areas were repeatedly mentioned throughout the study. The executive summary concluded that "Vashon and Maury Islands are important considerations in nearshore salmon recovery efforts even though the area does not contain any Chinook-bearing streams." COE AR at 8197.

The NMFS consultation letter did not address these Brennan study data showing significant Chinook presence in the Vashon/Maury nearshore areas well past mid-summer and into the fall. Instead, the Service adopted the conclusion from Northwest's BE, set forth above, to find that juvenile Chinook would be "minimally present" during the work period beginning August 15. The work cited in the BE was a single study, designated "EVS 2000", which relied heavily on the absence of natal streams in the area—a factor which the Brennan study demonstrated did **not** reduce the presence of Chinook in the study area. Sampling methods and data collected in the EVS 2000 study were not described in the BE, while they were presented in detail in the Brennan report. Data in the Brennan study demonstrate that the "minimally present" conclusion in the February 2004 consultation letter was not based on a full consideration of available evidence in the record. On the contrary, the Brennen study data and conclusions indicate that work windows beginning in mid-August do not protect juvenile salmon, which are present in the area at that time.

While the Court may not substitute its judgment for that of the agencies, it should "engage in a careful, searching review to ensure that the agency has made a rational analysis and decision on the record before it." *National Wildlife Federation v. NMFS*, 524 F.3d 917, 927 (2008). That searching review includes a careful look at what evidence was considered or not considered by the agencies,

ORDER - 9

including the source of the data and the scientific methods used. The statutory and administrative scheme affords federal agencies discretion to determine whether any actions on their part "may affect" any listed species or critical habitat, but that discretion is reviewed for abuse. While an action agency (here, the Corps) is not required by law to consult the Service, the minimum threshold for an action agency to initiate consultation is low. The "may affect" standard "must be set sufficiently low to allow Federal agencies to satisfy their duty to 'insure' under section 7(a)(2)[that species are not jeopardized]." 51 Fed.Reg. 19926, 19949 (June 3, 1986).

The question, then, is not whether the law mandates the Corps to initiate formal consultation with the Service, but whether the Corps arbitrarily and capriciously issued "no effect" determinations in the face of scientific evidence suggesting specific and serious effects on Chinook. Instead, the question is whether the Corps violated the plain meaning and intent of Section 7(a)(2) of the ESA by ignoring or disregarding available evidence that would require formal consultation with the Service. The Court finds that in ignoring the evidence presented in the Brennan study, the Corps (and the Service in concurring) acted arbitrarily and capriciously, and in violation of ESA. The "not likely to adversely affect" conclusion regarding Chinook was not based on rational analysis and decision on the record. *National Wildlife Federation v. NMFS*, 524 F. 3d 917, 927 (2008).

2. The consultation failed to analyze construction noise.

Plaintiffs note that NMFS has formerly determined that noise levels of 180 decibels (dB) are sufficient to cause injury to or harass salmon and Orcas, and therefore has required formal consultation in other pier construction projects, such as the Anacortes Pier and Seattle Aquarium projects. On this project, however, neither Northwest, the Corps or NMFS adequately addressed the actual quantitative noise levels from the pile-driving. Instead, plaintiffs argue, NMFS simply concurred in the determination that a bubble curtain was adequate to protect fish—despite the fact that their own expert, NMFS biologist John Stadler, opined that even with a bubble curtain the pile driving would result in both "take" and harassment of salmon. COE AR 12774-5. Plaintiffs assert that even a low level of take triggers formal consultation and the issuance of a full Biological Opinion.

Defendants contend that plaintiffs' arguments are based on statements taken out of context from

the John Stadler memorandum, which itself was a response to concerns raised by plaintiff Preserve Our Islands ("POI"). *Id.* However, when placed in context, Dr. Stadler's remarks fully support plaintiffs' contention regarding the necessity for a full formal consultation.

After discussing the peak sound pressure level generated by pile-driving with and without a bubble curtain, Dr. Stadler explained,

> There is a relationship between the size of a fish and the sound energy required to injure it. The 180 dB threshold was intended to protect those smallest of salmon, which will not likely be present in the project area when pile driving is scheduled. The larger the fish, the more energy it takes to injure it.
>
> . . . .
>
> So POI is correct that the thresholds for "take" will be exceeded. However, that does not mean that NMFS conducts formal consultation on all pile driving projects that exceed the thresholds. We look at the time of year when it is proposed and the amount of impact driving that will occur. **If it is done at a time of year when the juveniles are no longer nearshore dependent, the effects will be lower**. Potential effects are greatest when the juvenile salmon are very small and are obligate users of the shallow nearshore waters. . . . Larger, non-nearshore dependent salmon are less likely to suffer direct physical injury or to be "injured" by behavioral disruption. If impact driving is limited to proofing of the piles, the potential effects will be significantly reduced because fewer fish will be exposed (a shorter drive time means fewer fish will enter the zone of effect) and the duration of exposure will be short—both of which reduce the potential for physical injury. It would be rare for NMFS to conduct a formal consultation on 24-inch diameter piles based solely upon the behavioral effects from pile driving if it is conducted in the normal in-water work window and impact hammer use will be limited to proofing the piles with a bubble curtain.
>
> NMFS must conduct a formal consultation and write a biological opinion if any take is likely to occur, whether that is to one fish or to all of the fish. The fact that "take" may occur does not, by itself, mean that the project should be stopped. It all depends on the level of take, i.e., the number of fish that will likely be injured, either through direct physical effects or through disruption of essential behavior patters. **Although I don't know much about this particular project, if they are driving the piles during the normal in-water work window and are using a bubble curtain, then the level of take may actually be low**.

COE AR 12774-5 (emphasis added).

This statement is significant in several aspects. First, the supposition that "take" will be low because work will be done at a time of year when the juvenile Chinook are no longer "nearshore dependent" relies on the very determination that was found faulty above. The Brennan study found that juvenile Chinook were present in the nearshore area of Vashon and Maury Islands well into the work window period. Therefore, the assertion that "take" would be low is not supported by a careful consideration of data in the record. Second, the conclusions reached by Dr. Stadler regarding low take

ORDER - 11

are speculative and based on several "ifs" regarding the type and timing of the pile-driving work, the bubble curtain, and other project-specific factors which the author admitted he did not know. Third, even applying the presumption that work would proceed when "effects would be lower" due to reduced presence of juvenile Chinook, Dr. Stadler concluded that "the level of take may actually be low." Again and again he referred to "low" take, not "no" take, from noise impacts. Nowhere did he posit that take would be reduced to zero by the mitigation actions. Given the standard, correctly articulated by Dr. Stadler that "NMFS must conduct a formal consultation and write a biological opinion if any take is likely," the Court concludes that formal consultation should have taken place on the effects of noise impacts on juvenile Chinook.

      3.  <u>The consultation failed to analyze operational noise and its effect on juvenile salmon</u>.

This claim addresses the operational noise of loading and moving the barges. Plaintiffs assert that the Corps relied on outmoded data in concluding that fish would habituate to the noise. Plaintiffs also note that the agencies ignored the massive increase in noise over ambient levels—from around 70-85 dB up to 130-170dB from the barge operations, and erred in concluding that fish would habituate to the noise. The BE did not relate operation noise effect to the presence of juvenile Chinook in the area—juvenile fish which are in the expert opinion of Dr. Stadler more subject to injury from the effects of noise. Nor did the BE address the fact that noise-generating barge operations will occur year-round, not just within the work window that was supposed to protect juvenile Chinook.

The effects of operational noise from gravel mining, barge loading, and tugboat operations were discussed in the BE at pages 63-66. COE AR 5478-66. The discussion presents some generalized statements and conclusions but is devoid of measurements and other data, apart from the statement that tugboats would be present at the dock only eight percent of the time, so that "no tugboat related noise impacts would occur 92 percent of the time." COE AR 5481. Based on this eight percent, the BE proposed that "it is reasonable to conclude that tugboat operations at the dock will not prevent fish from using habitat near the dock." *Id*. No data were presented to support this "reasonable conclusion." Further, the BE wrote off any adverse effects from noise resulting to barge-loading, by claiming that "[m]ost of the noise resulting from aggregate landing on the barge deck will either be dissipated into air

ORDER - 12

or muffled by aggregate accumulated on the deck of the barge." *Id*.  Again without any supporting data, the BE then concluded that "fish are unlikely to hear gravel landing on the deck of the barge." *Id*.  Even if the BE is correct about the "muffling" effect of a layer of gravel in the barge, this conclusion wholly fails to consider the initial noise resulting from gravel loading into an empty barge.  As to that initial pour of gravel into the empty barge,  the BE stated that "[i]f gravel landing on the empty barge deck does elicit a behavioral response, the response would be temporary because the noise would be muffled by aggregate as the barge was loaded." *Id*.  No data were presented on actual underwater noise levels that would result from this loading, or of fish responses to such noise, nor were the effects of repeated barge-loading noise discussed.  Given Dr. Stadler's statements on the level of noise that can injure juvenile salmon and result in "take", the actual noise levels from loading operations must be presented and discussed.

In adopting this conclusory assessment on operational noise and its resulting "no adverse impact" conclusion without full consideration and formal consultation, the agencies failed to carry out their duty to "insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical habitat] of such species." 16 U.S.C. § 1536(a)(2).

4. Review of impacts to forage fish was arbitrary and capricious.

Plaintiffs contend that instead of analyzing the effects of the project on forage fish (herring and others), NMFS initially assumed that the project construction would be completed when forage fish are not spawning. COE AR 6679.  However, once the presence of spawning fish was documented at the site, the federal agencies reinitiated consultation COE AR 10297.  NMFS considered an addendum to the BE for forage fish, prepared by a consultant for Northwest (Grette Associates Environmental Consultants, or "GAEC") on June 14, 2006, together with a forage fish survey prepared by the Washington Department of Fish and Wildlife (WDFW) on June 21, 2006.  These materials appear in the record (along with other documents relating to steelhead, not at issue here) at COE AR 10303 through 10344.  The NMFS conferencing letter dated November 6, 2006 again concurred in the Corps' "may affect---unlikely to adversely affect" determination without any analysis or consideration of the additional information on

forage fish other than to mention the two Grette Associates letters.  COE AR 10346.  Given that the information indicated the presence of spawning forage fish, the consultation should have included analysis of the impacts of various aspects of the project, particularly noise, on the forage fish, as a component of the critical habitat designated for Chinook.

5.  <u>Extending the dock to protect eelgrass beds</u>.

Plaintiffs contend that the construction and barge operations will adversely affect nearby eelgrass beds, damaging critical habitat.  Eelgrass beds are an important component of the nearshore environment, particularly in relation to juvenile salmon.  Project diagrams indicate two large eelgrass beds in the vicinity, one at either end of the project area, as well as a smaller one nearer the dock.  COE AR 5605.  NMFS found that the effects of eelgrass bed disturbance would be minimized by the decision to extend the dock into deeper water, so that barges would load farther from shore.  However, the anticipated reduction was not quantified.  COE AR 6679.  The Corps noted that the velocity and effects of propeller wash on bed scour and turbidity of the nearshore water had not been "conclusively determined."  COE AR 13225.  Thus there is no factual basis for the determination that the extended dock "would avoid serious disturbance of the substrate across the site and particularly in the vicinity of the eelgrass."  *Id*. The actual effect on eelgrass beds needs to be quantified, not assumed.

6.  <u>Failure to re-initiate consultation</u>.

Plaintiffs contend that the agencies failed to re-initiate consultation to consider the effect of the project on Chinook critical habitat after that habitat was designated for Chinook in September, 2005.  Pursuant to regulations,  the Corps was required to re-initiate consultation when new information (such as the designation of critical habitat) "reveals effects of the action that 'may effect' a listed species."  50 C.F.R. § 402.16(b).  Defendants assert that the Corps requested conferencing on April 29, 2005 regarding the proposed listing of SR Orca, as well as the proposed designation of critical habitat for Chinook.   As set forth above, the NMFS responses were provided in November, 2006  and on January 19, 2007.  Neither specifically addresses the effects of the project on Chinook critical habitat;  Chinook were mentioned as prey for Orca and therefore a component of Orca critical habitat.  COE AR 10345-55; 10378-80.  NMFS adhered to its previous concurrence that the project as modified was "not likely to

ORDER - 14

adversely affect" listed Puget Sound Chinook, and then concluded without further analysis that "[s]ince adverse affects to Puget Sound Chinook or Chinook critical habitat are not anticipated, it is extremely unlikely that the [sic] either the quality or quantity or [sic] of this prey species or its availability to killer whales will be affected by this project." COE AR 10353, ¶ 2. The failure to provide any actual analysis of effects on Chinook critical habitat constitutes a serious flaw in this determination.

7. The Orca consultation was arbitrary and capricious.

SR Orcas were declared endangered on November 18, 2005. In the ESA determination, NMFS specifically identified actions that could potentially result in "take" of Orcas—including coastal development such as pile driving, and vessel operations resulting in noise levels that could disrupt foraging, communication, or care of the young Orcas. 70 FR 69911. Plaintiffs contend that the informal consultation process did not take these potentially serious effects of the project into account. Instead, even after Orcas were listed as endangered, NMFS simply concurred in the earlier Corps determination that the project was not likely to adversely affect SR Orcas. Plaintiffs contend that this determination was based on the false assumption in the BE that the area is used only sporadically by Orcas. Plaintiffs argue that despite significant evidence to the contrary received in public comments, Northwest's BE continued to assert that there was no prolonged Orca presence near the site during the work window. AR COE 7821-22. Plaintiffs argue that there is ample evidence of Orca presence in the area, particularly in fall and winter. Plaintiffs contend that the failure to address this evidence in the NMFS November, 2006 conference letter renders the determination of "no adverse effect" arbitrary and capricious.

At the time plaintiffs requested a TRO, in December, 2008, Orcas were documented in the area only the first day of the work period; after that they were not seen anywhere near the work area, apart from a brief sighting on December 12, 2008 near Brown's Point. The Court denied the TRO on the basis that no evidence was presented that Orcas were in the area. However, that determination is not significant in the present context, where the Court is reviewing agency action and consideration of the evidence in the record. As discussed at oral argument, the dearth of Orca sightings near the work area last December and January raises the question as to whether the whales' absence might have been caused by the project noise, rather than normal seasonal behavior patterns.

ORDER - 15

In 2005, in anticipation of the listing of the SR Orca as an endangered species, Northwest prepared an Addendum to the BE, to evaluate the effects on the SR Orca. COE AR 7878-7853. The Addendum found that

> Southern Residents visits to the Project Vicinity, and to South Puget Sound in general, are primarily during the months of November, December, and January. This use coincides with South Puget Sound winter runs of chum salmon, a prey species believed to be targeted by Southern Residents in this area, although bottom fish and resident Chinook salmon (primarily hatchery-based stock known as "winter blackmouth") are also available in this area during this time.
>
> . . . .
>
> While Southern Residents have been observed off Maury Island and the eastern shore of Vashon Island, the Project site represents only a fraction of the range of the highly mobile Southern Residents. Based on a review of the sighting records maintained by the Orca Network (www.orcanet.org), killer whale sightings in the Project Vicinity are sporadic and many appear to be individuals in transit to the north or south or on foraging runs, with no prolonged presence near the Project site.
> . . .
>
> Sightings in the Project vicinity include both southern and northern movements off the eastern shoreline of Maury Island, Many sighting have been made from the Vashon/Fauntleroy Ferry, a fact likely attributed as much to the number of people riding the ferry and the high visibility of whales from the ferry, as to the presence of the whales themselves. . . .
>
> Therefore, the Project site is considered to be part of a relatively broad and seasonal range for Southern Residents.

COE AR 7820-22. Attached to the Addendum at Appendix I is a "sample of sightings" reported to Orca Network, a volunteer organization that collects reports of Orca sightings. The introduction to the Appendix notes that this is "by no means a scientific sample." COE AR 7844.

The BE Addendum concluded that the project "is not likely to jeopardize the continued existence of Southern Resident killer whales." COE AR 7811. In a June 21, 2005 response to the Corps request for conferencing on the proposed listing of the SR Orca, NMFS concurred with the Corps determination that the proposed project "is not likely to jeopardize the continued existence of the SR Orca." COE AR 8058. The letter concluded that "[t]he project would not significantly interfere with their seasonal use of the project vicinity." *Id*. A subsequent addendum to the BE, prepared after the SR Orca was actually listed as an endangered species, continued to represent that the SR Orca visits the project area only sporadically and does not "linger" there. COE AR 10173. The basis for this conclusion was stated in the

ORDER - 16

BE: "With two relatively large residential shoreline developments located on southeast shorelines of Maury Island, it is reasonable to expect that if the Project Site were a place where Southern Residents regularly visited and lingered, then there would be more sighting records from this area compared to other areas around Vashon-Maury Islands."  COE AR 10173.

What is missing here is science.  The conclusions in the BE Addenda regarding SR Orca presence and "lingering" in the project area were based on random reports by a volunteer network.  As noted in the BE itself, this was not a scientific sampling.  To base a conclusion regarding Orca "lingering" in the area on a paucity of such reports in comparison to other areas is particularly egregious.  There is no way to determine how many Maury Island residents are part of the sighting network or how frequently they attempted to sight Orcas in the project vicinity.   The paucity of reports may simply indicate a paucity of reporters, not of Orcas.

Plaintiffs, on the other hand, have presented for inclusion in the record evidence in the form of summaries of scientific studies and reports, such as the "Peer Review of the Proposal to List Southern Resident Killer Whales under the Endangered Species Act," by David Bain.  COE AR 8617-40.  They also presented evidence in the form of letters and hearing testimony regarding the importance of the wintering grounds around Maury Island as feeding grounds for female Orcas and their newborn.  COE AR 10077-78, 7973-74.  They also point out that data from Orca Network reported sightings were used selectively in the BE, omitting many sightings from the project area, and the data were not properly analyzed.  COE AR 10073, 10078.  By failing to address these concerns expressed in the record, and by simply adopting the flawed BE Addendum conclusions regarding SR Orca presence in the area, the agencies acted arbitrarily and capriciously.

8.  The conference letter understates construction noise effects.

As with their Chinook argument, plaintiffs note that NMFS has elsewhere acknowledged that noise levels of 180 dB can cause serious injury to Orcas, such as hearing loss (temporary or permanent) and behavior disruption.  Further, NMFS has elsewhere found that pile driving noise of even 120dB is sufficient to harass Orcas.  However, while acknowledging these potential affects, the conference letter downplays them on the basis that exposure would be limited because Orcas would simply not be present

ORDER - 17

during the work window. Thus, while "killer whales could be exposed to sound in excess of the levels currently described by NMFS as having the potential to cause behavioral disruption," they will not be injured because "they are likely to be present for only a few days each month in the October through January timeframe." AR COE 10348-49. Further, according to the BE, injury will be prevented because the monitoring program will suspend pile driving any time Orcas are actually present. *Id*.

The deficiencies in this cursory analysis are obvious. First of all, it is based on the assumption that Orcas are present in the area only a few days during each month of the work window. This assumption was deemed flawed above, as it is based not on scientific evidence or data but for the most part on the absence thereof. Further, while the monitoring program may insure that no pile driving takes place while Orcas are present, it is improper to rely on that monitoring as a basis for determining no adverse effect. Displacement of the Orcas from important feeding areas would itself be an adverse effect, one that the monitoring program does not address in any way. The Court therefore finds that the noise effect determinations were based on inadequate analysis of potential adverse effects.

9. <u>The Orca critical habitat review was arbitrary and capricious</u>.

The area adjacent to Maury Island is within the designated critical habitat for Orcas. Plaintiffs contend that the NMFS determination that Orca habitat would not be adversely affected was improperly based on the false assumption that prey species would not be affected by the project. Indeed, the November 6, 2006 conference letter stated, as part of the "no adverse effect" determination for critical habitat, that "NMFS has previously determined that the project as modified is 'not likely to adversely affect' listed Puget Sound Chinook." COE AR 10353. The determination concluded that "[s]ince adverse affects [sic] to Puget Sound Chinook or Chinook critical habitat are not anticipated, it is extremely unlikely" that the availability of this prey species would be affected by the project. *Id*. The conclusion is flawed in that it relies on the inadequate Chinook critical habitat determination. Further, only Chinook are considered; project impact on other important Orca forage species, such as the chum salmon mentioned in the BE Addendum, were not addressed at all.

Critical habitat includes space for passage. NMFS concluded that the Orcas could simply avoid noise disruption by moving further out into the East passage channel. COE AR 10353. This conclusion

ORDER - 18

fails to address the possibility that noise might cause the Orcas to avoid the area altogether, thereby losing an important component of their critical habitat.

Finally, it appears that nowhere in the record was the 2008 Orca Recovery Plan addressed. This Recovery Plan was developed by NMFA and notice was published in the Federal Register on January 24, 2008. 73 FR 4176. This recovery plan was new information which required re-initiation of consultation under 50 C.F.R. § 402.16(b).

Conclusions under the Endangered Species Act

The Court has determined that the informal consultation process resulted in the arbitrary and capricious issuance of "no adverse effect" determinations in the face of scientific evidence in the record which suggests specific and serious effects on Chinook and SR Orcas. The Court finds that the Corps violated the plain meaning and intent of Section 7(a)(2) of the ESA by ignoring or disregarding evidence that would require formal consultation with the Service. The Court shall grant in part plaintiff's motion for summary judgment on the ESA claims and remand to the agency for formal consultation and the preparation of a Biological Opinion which includes full and meaningful consideration of the Chinook and SR Orca Recovery Plans. 16 U.S.C. § 1536(b)(3)(A); *Pacific Rivers Council v. Thomas*, 30 F.3d at 1054 n. 8. No work under the permit shall proceed until these requirements have been met, and an appropriate injunction shall issue as set forth below.

## II. **National Environmental Policy Act (NEPA) Review**

The National Environmental Policy Act has "twin aims. First, it places upon [a federal] agency the obligation to consider every significant aspect of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983) (citation and internal quotation marks omitted). NEPA does not contain substantive environmental standards. Rather, it "establishes 'action-forcing' procedures that require agencies to take a 'hard look' at environmental consequences." *Metcalf v. Daley*, 214 F.3d 1135, 1141 (9th Cir.2000); see also *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989).

NEPA requires federal agencies to prepare an Environmental Impact Statement ("EIS") prior to

ORDER - 19

taking "major Federal actions significantly affecting the quality" of the environment. 42 U.S.C. § 4332(2)(C).[3]  Some proposed federal actions categorically require the preparation of an EIS.  If the proposed action does not categorically require the preparation of an EIS, the agency must prepare an Environmental Assessment ("EA") to determine whether the action will have a significant effect on the environment. See 40 C.F.R. § 1501.4 (Council on Environmental Quality ("CEQ") regulations implementing NEPA); *Metcalf*, 214 F.3d at 1142.  If the EA reveals that the proposed action will significantly affect the environment, then the agency must prepare an EIS.  If the EA reveals no significant effect, the agency may issue a Finding of No Significant Impact ("FONSI"). See 40 C.F.R. §§ 1501.4, 1508.9; see also *Metcalf*, 214 F.3d at 1142.

       The Court reviews an agency's compliance with NEPA under the Administrative Procedure Act ("APA").  *Id.*  Judicial review consists of ensuring that an agency has taken a "hard look" at the consequences of its actions, based its decision on due consideration of the relevant factors, and provided a "convincing statement of reasons to explain why a project's impacts are insignificant."  *National Parks & Conservation Association v. Babbitt*, 241 F. 3d 722, 730 (9th Cir. 2001).  The Court applies a "rule of reason" standard, which is applied in the same manner as the APA arbitrary and capricious standard. *Center for Biological Diversity v. USFS*, 349 F.3d 1157, 1166 (9th Cir. 2003) (internal citations omitted).

---

     [3] Section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C), requires that, "to the fullest extent possible ... all agencies of the Federal Government" shall:

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on-

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

ORDER - 20

In determining whether a project may have a significant effect on the environment, the courts turn to the NEPA regulations that define "significantly". *Native Ecosystems Council v. U.S. Forest Service*, 428 F.3d 1233, 1239, (9th Cir. 2005). Whether a project is significant depends both on the project's context and its intensity. 40 C.F.R. § 1508.27 (2000). Among the factors to be evaluated are "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial", and "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts." 40 C.F.R. §§ 1508.27(b)(4); 1508.27(b)(7).

In considering a NEPA challenge, the Court "may not substitute its judgment for that of the agency concerning the wisdom or prudence of a proposed action." *Laguna Greenbelt, Inc., v. U.S. Department of Transportation*, 42 F. 3d 517, 523 (9th Cir. 1994) (*quoting Oregon Environmental Council v. Kunzman*, 817 F. 2d 484, 492 (9th Cir. 1987)). In interpreting NEPA, the Court gives substantial deference to the regulations issued by the Council on Environmental Quality ("CEQ"), and both NEPA and the regulations are to be strictly interpreted. *Center for Biological Diversity*, 349 F. 3d at 1166. "Grudging, *pro forma*, compliance will not do." *California v. Block*, 690 F. 2d 753, 769 (9th Cir. 1982).

Plaintiffs contend that the Corps violated NEPA by simply issuing a Finding of No Significant Impact instead of preparing an Environmental Impact Statement. In considering this claim, the Court considers whether the Corps in its 2008 Environmental Assessment has taken a "hard look" at the consequences of issuing a permit for the project, and whether it has provided a convincing statement of reasons to explain why the project's impacts are insignificant. *National Parks & Conservation Association v. Babbitt*, 241 F.3d at 730. "An agency cannot avoid its statutory responsibilities under NEPA merely by asserting that an activity it wishes to pursue will have an insignificant effect on the environment." *Alaska Center for the Environment v. U.S. Forest Service*, 189 F.3d 851, 859 (9th Cir. 1999), *quoting Jones v. Gordon*, 792 F.2d 821, 828 (9th Cir. 1986).

Plaintiffs have identified the following areas in which they allege the Corps failed to meet its obligations under NEPA. The Court shall address them separately.

1. The EA failed to evaluate the "no action" alternative.

An EA must rigorously analyze and compare all reasonable alternatives to the proposed action. This analysis must include the "no action" alternative. 40 C.F.R. § 1502.14(d). This analysis is required even if that analysis does not trigger the preparation of a full EIS. *Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1228 (9th Cir. 1988).

Plaintiffs contend that the Corps' "no action" analysis did not constitute a "hard look" because it is based on the assumption that if the permit were not issued, the old dock would remain and would continue to shade the area and degrade, leaching creosote into the water. COE AR 13206. According to plaintiffs, this assumption is flawed because had the permit been denied, Northwest would still have been required, under the terms of the expired State land lease, to remove the old dock. While defendants argued throughout the briefing stage that there was no support for this assertion, it was determined at oral argument that the terms of the expired lease do require removal of that portion of the dock which is sited on State land. Plaintiffs are therefore correct that the "no action" alternative analysis was based on a false assumption.

2. The EA fails to examine reasonable alternatives.

Plaintiffs complain that the EA described the purpose of the project as providing sand and gravel by waterborne transport to meet the market demands of Central Puget Sound. COE AR 13202. Then, in further discussion, the Corps considered only Central Puget Sound sources for that sand and gravel. COE AR 13205. By limiting the origin of that sand and gravel to Central Puget Sound, the Corps excluded consideration of reasonable alternatives to Northwest's project, such as cost-competitive gravel from a Canadian source in coastal British Columbia. Indeed, the "off-site alternatives" section noted that Northwest "is currently purchasing and transporting sand by barge from Canada to meet their needs and those of their customers." COE AR 13204. It was therefore unreasonable for the Corps to conclude on the following page that "offsite and new mine alternatives are either unavailable to the applicant, cost prohibitive to the applicant, not currently feasible, would result in greater environmental impacts, and/or would not accomplish the project purpose." COE AR 13205. The record contains a report prepared for the Canadian Ministry of Transportation, demonstrating that aggregates from coastal British Columbia sources could be transported by water to the Puget Sound region on a cost-effective basis. COE AR

ORDER - 22

12911, 12961.  By disregarding this alternative source to the project proposal, the Corps failed to take the requisite "hard look".

3. <u>The EA fails to explain why the project's cumulative impacts are insignificant</u>.

In determining the scope of the required NEPA analysis, an agency must consider not only the proposed action, but also three types of related actions:  "connected actions," "similar actions," and "cumulative actions." 40 C.F.R. § 1508.25(a). "Cumulative actions" are those "which when viewed with other proposed actions have cumulatively significant impacts." 40 C.F.R. § 1508.25(a)(2).  In determining the significance of a proposed action, an agency must consider

> Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

40 C.F.R. § 1508.27(b)(7). *See also Churchill County v. Norton*, 276 F.3d 1060, 1072 (9th Cir. 2001). The regulations define "cumulative impact" as:

> the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7.

In the "Cumulative Impacts" section, the EA narrowly focused on the small geographic area around Maury and Vashon Islands, considered mainly land-based effects, and only identified "bulkhead repair" or "shoreline protection projects" as foreseeable future events to be considered.  COE AR 13241-13244.  The "environmental consequences" of the cumulative impact were deemed to be only the effects on the immediate gravel mine area (loss of forest cover and wildlife habitat), and limited effects on the shoreline area:

> While the proposed project and mitigation does not reverse past adverse impacts in the project area; [it] does not further contribute to the already degraded shoreline.  The project will not significantly contribute to the areas' [sic] adverse cumulative impacts as the proposed work is within an already disturbed area although it is located next to a State aquatic reserve.  Aquatic impacts will be reduce [sic] and/or avoided and the proposed construction methods and mitigation measures presented in Section 6 "proposed Mitigation Measures", mitigation plans in appendix C

ORDER - 23

and conditions of state and local permits in appendix D will offset the adverse impacts from the construction and operation of the dock.

COE AR 13244.

This narrow geographic focus and limitation on future events to be considered undercut the scope and effect of the cumulative effects analysis. The assumption that mitigation proposals would negate any adverse effects on the environment is not supported by any factual analysis. Cumulative impacts from operations (tugboat traffic, barge-loading, and so forth) were not discussed at all. Further, the conclusion that the proposed project would not contribute to cumulative effects because the shoreline in the area was already disturbed is an improper application of the cumulative effects standard. Finally, the EA mentioned but did not evaluate the fact that the area is located near a State aquatic reserve—indeed it erred in stating that the area is "next to" the reserve, as much of the project area is **within** the Maury Island Aquatic Reserve. This cursory cumulative effects analysis is a serious deficiency in the EA that alone would trigger the Court's finding of non-compliance with NEPA.

Consideration of cumulative impacts requires "some quantified or detailed information; . . . [g]eneral statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." *Neighbors of Cuddy Mountain*, 137 F.3d 1372, 1379-80 (9th Cir. 1998). The cumulative impact analysis must be more than perfunctory; it must provide a "useful analysis of the cumulative impacts of past, present, and future projects." *Muckleshoot Indian Tribe*, 177 F.3d 800, 810 (9th Cir. 1999).

When an agency's determination of what are "reasonably foreseeable future actions" and appropriate "component parts" is " 'fully informed and well-considered,' " the Court shall defer to that determination. *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998) (quoting *Save the Yaak Comm. v. Block*, 840 F.2d 714, 717 (9th Cir. 1988)). But the Court "need not forgive a 'clear error in judgment.' " *Id*. That error was committed here when the Corps so narrowly limited the geographic scope of the analysis to "Vashon/Maury Island and the surrounding marine waters." COE AR 13211. That error was further compounded by limiting the impacts considered to mainly land-based impacts such as logging, agriculture, and real estate development on the islands.

ORDER - 24

COE AR 13242-43.

Defendants contend that it was within the Corps' discretion to determine the scope of the cumulative impacts analysis, as there are not specific requirements in the law of NEPA. To address this contention, the Court must review the law in this area as it relates to EIS and EA considerations. Although federal regulations do not "explicitly require" an EIS to include a discussion of cumulative impacts, they do "direct [ ] agencies to consider cumulative impacts in determining the scope of an EIS." *Edwardsen v. United States Dep't of Interior*, 268 F.3d 781, 786 (9th Cir. 2001), *citing* 40 C.F.R. § 1508.25(c)(3). The courts have interpreted the regulations to require that the EIS consider the cumulative impact of the proposed action. *Id.* at 786-90; *see also Neighbors of Cuddy Mountain*, 137 F.3d at 1378 ("[W]here 'several actions have a cumulative ... environmental effect, this consequence must be considered in an EIS.'") (citations omitted).

Similarly, NEPA regulations contain only a brief description of the requirements for an EA, and do not specifically mention cumulative impact analysis. Instead, they state that an EA must:

(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.

(2) Aid an agency's compliance with the Act when no environmental impact statement is necessary.

(3) Facilitate preparation of a statement when one is necessary.

40 C.F.R. § 1508.9(a). Further, an EA "[s]hall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E) [of NEPA], of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(b).

The Ninth Circuit Court of Appeals has noted that

We have held that an EA may be deficient if it fails to include a cumulative impact analysis or to tier to an EIS that has conducted such an analysis. *See Hall v. Norton*, 266 F.3d 969, 978 (9th Cir. 2001); *Blue Mountains Biodiversity Project*, 161 F.3d at 1214; *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1152 (9th Cir. 1998). Other circuits have also recognized the requirement that, in appropriate cases, an EA must include a cumulative impact analysis. *See, e.g. Soc'y Hill Towers Owners' Ass'n v. Rendell*, 210 F.3d 168, 180(3d Cir. 2000) ("[I]f the cumulative impact of a given project and other planned projects is significant, an applicant can not simply prepare an EA for its project, issue a FONSI, and ignore the overall impact of the project ..."); *Newton County Wildlife Ass'n v. Rogers*, 141 F.3d 803, 809 (8th Cir. 1998) (holding that an EA adequately addressed cumulative impacts where it covered a timber sale

ORDER - 25

involving 1,871 acres but considered environmental impacts on 26,699 acres). The importance of analyzing cumulative impacts in EAs is apparent when we consider the number of EAs that are prepared.  The Council on Environmental Quality noted in a recent report that "in a typical year, 45,000 EAs are prepared compared to 450 EISs.... Given that so many more EAs are prepared than EISs, adequate consideration of cumulative effects requires that EAs address them fully." Council on Environmental Quality, Considering Cumulative Effects Under the National Environmental Policy Act at 4, Jan. 1997, also available at http://ceq.eh.doe.gov/nepa/ccenepa/ccenepa.htm (last visited Feb. 26, 2002) (emphasis added).

*Kern v. United States Bureau of Land management*, 284 F. 3d 1062, 1076 (9th Cir. 2002).

The major focus of the review of this project under ESA and NEPA has been on water quality and, habitat considerations for the listed species which may be affected by this project.  By so narrowly defining the geographic scope of the cumulative impact analysis, the Corps failed to give meaningful consideration to "the impact on the **environment** which results from the incremental impact of the action. . . ." 40 C.F.R. § 1508.7 (emphasis added).  Further, there was  no meaningful cumulative impact analysis of  "reasonably foreseeable future actions" that, in combination with the proposed project, could constitute "collectively significant actions ... over a period of time."  *Id.*   The EA only looked at future local effects such as bulkhead repairs and residential development, in complete disregard of the broader picture involving incremental factors which could affect the marine environment.  COE AR 13244.  Because the EA does not perform an adequate cumulative effects analysis, the Court finds it inadequate under NEPA.

4. <u>Controversial or uncertain effects</u>.

An agency is required to prepare an EIS if the effects on the human environment of a project are "likely to be highly controversial" or when the possible effects on the human environment are "highly uncertain."  40 C.F.R. § 1508.27(b)(4), (5).  The controversy to which this refers is not political, social or public, but scientific.  Plaintiffs have adequately demonstrated such controversy, by pointing to materials in the record that demonstrate significant disagreement among experts regarding the effects of the project on critical habitat for certain listed species, namely Chinook and SR Orcas.  While defendants seek to place emphasis on the term  "human" environment, the Court finds no such distinction in the NEPA regulations as they are read in context.  The quality of the marine environment in Puget Sound, including the health and well-being of the plant and animal communities, are all integral parts of the "human

ORDER - 26

environment". The materials in the record demonstrate that the action contemplated here is "highly controversial" and that the potential effects are "highly uncertain" as to the impacts on the human environment of Puget Sound. These determinations compel the conclusion that the EA was inadequate, and a full EIS should be prepared.

<u>Conclusions under NEPA</u>

Upon review of the June 2008 EA and accompanying FONSI, the Court finds that the Corps has not provided a convincing statement of reasons to explain why the project's impacts on the environment are insignificant. *National Parks & Conservation Association,* 241 F. 3d at 730. The Court shall accordingly grant plaintiffs' motion for summary judgment as to the NEPA claims.

**III.  <u>Rivers and Harbors Act Review</u>**

Having determined that the plaintiffs are entitled to summary judgment on their ESA and NEPA claims, the Court finds it unnecessary to compete the additional analysis under the Rivers and Harbors Act.

CONCLUSION

"Which raindrop caused the flood?"  With those closing words (and due credit to the author), plaintiffs at oral argument expressed the central issue here.  No single project or human activity has caused the depletion of the salmon runs, the near-extinction of the SR Orca, or the general degradation of the marine environment of Puget Sound.  Yet every project has the potential to incrementally increase the burden upon the species and the Sound.   Human development will always have *some* impact on the surrounding environment.  The Court fully recognizes the desirability and economic necessity of industrial progress in order for a community to flourish.  However, under the National Environmental Policy Act and the Endangered Species Act,  it is the federal agencies' obligation to ensure that this progress does not cause irreversible harm to the environment.  Thus, NEPA provides a mandate to the agencies  "to consider every significant aspect of the environmental impact of a proposed action", and "to inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc*., 462 U.S. 87, 97 (1983) .  It is then this Court's role to ensure that the agencies have taken that requisite "hard look" at the environmental

ORDER - 27

consequences for the proposed project. *Metcalf v. Daley*, 214 F.3d at 1141. Having reviewed the record, the Court finds that hard look at environmental consequences lacking.

Accordingly, it is hereby ORDERED:

(1) Plaintiffs' motion for summary judgment is GRANTED as to their claims under the Endangered Species Act and National Environmental Policy Act;

(2) Defendants' cross-motions for summary judgment are DENIED; and

(3) Plaintiffs' motion for an injunction is GRANTED IN PART. Defendant-Intervenor Northwest is hereby ENJOINED from taking any further action under the Section 10 permit until such time as the Federal agencies have fully complied with the terms of this Order by (a) initiating and completing a full formal consultation under ESA, including the preparation of Biological Opinions as to Chinook and SR Orcas, and (b) completing an Environmental Impact Statement under NEPA.

DATED THIS 13th day of August, 2009.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE

ORDER - 28